## STATE OF CONNECTICUT v. TIMOTHY BARTON
### (14094)

PETERS, C. J., SHEA, CALLAHAN, GLASS, COVELLO, BORDEN and SANTANIELLO, Js.

Argued May 1—decision released July 16, 1991

*Susan C. Marks,* assistant state's attorney, with whom was *Steven M. Sellers,* assistant state's attorney, and, on the brief, *John J. Kelly,* chief state's attorney, *Frank S. Maco,* state's attorney, and *Timothy J. Sugrue* and *John Dropick,* assistant state's attorneys, for the appellant (state).

*Walter H. Scanlon,* for the appellee (defendant).

*Jacob D. Zeldes, Paul F. Thomas* and *Shelley R. Sadin* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

PETERS, C. J. The sole issue in this appeal is whether, contrary to our holding in *State* v. *Kimbro,* 197 Conn. 219, 496 A.2d 498 (1985), article first, § 7, of the Connecticut constitution permits a court to determine the existence of probable cause on the basis of the "totality of the circumstances" when it reviews a search warrant application based on information provided to the police by a confidential informant. The state charged the defendant, Timothy Barton, with possession of over a kilogram of marihuana with intent to sell and with possession of marihuana, in violation of General Statutes §§ 21a-278 (b) and 21a-279 (b)[1] respectively, after police, acting under the authority of a warrant, had

---

[1] General Statutes § 21a-278 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marihuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

General Statutes § 21a-279 (b) provides: "Any person who possesses or has under his control any quantity of a hallucinogenic substance other than marihuana or four ounces or more of a cannabis-type substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than five years or be fined not more than two thousand dollars or be both fined and imprisoned, and for a subsequent offense may be imprisoned not more than ten years or be fined not more than five thousand dollars or be both fined and imprisoned."

searched his home and had seized more than fifty pounds of marihuana there. The defendant moved to suppress the seized evidence, and the trial court granted the defendant's motion on the ground that the affidavit accompanying the search warrant application failed to state the informant's "basis of knowledge." The charges were subsequently dismissed with prejudice. With the permission of the trial court, the state appealed to the Appellate Court, which affirmed. *State v. Barton,* 22 Conn. App. 62, 576 A.2d 561 (1990). We granted certification to reconsider the state constitutional issue presented,[2] and we reverse.

The opinion of the Appellate Court reports the relevant facts. On August 7, 1988, officers of the Winsted police department, acting on the authority of a search and seizure warrant obtained that day on the basis of information provided by a confidential informant, searched the defendant's apartment in Winsted. Although the defendant was not at home when the police arrived to execute the warrant, they obtained a key from the owner of the apartment. In the course of their search, the police found some fifty-two pounds of marihuana wrapped in clear plastic bags and kept in larger garbage bags in a bedroom. When the defendant returned home after midnight, the police arrested him. Id., 64.

The defendant filed a motion to suppress the evidence seized pursuant to the warrant, contending that the search and seizure violated his rights under article first, § 7, of the Connecticut constitution and the fourth

---

[2] Our order on the state's petition for certification to appeal; *State v. Barton,* 216 Conn. 810, 580 A.2d 61 (1990); granted the petition limited to the following issues:

"1. Should this court's holding in *State v. Kimbro,* 197 Conn. 219, [496 A.2d 498 (1985),] be reconsidered?

"2. Did the Appellate Court correctly determine that the affidavit failed to support a finding of probable cause?"

amendment to the United States constitution. Both the trial court and the Appellate Court applied the two-pronged analysis mandated by this court's decision in *State* v. *Kimbro,* supra, which requires a magistrate, in determining whether probable cause exists for a search or seizure, to evaluate both the "basis of knowledge" and the "veracity" or "reliability" of an informant upon whose information the police have relied. See id., 233–37; see also *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964). In the circumstances of this case, both the trial court and the Appellate Court concluded that the affidavit in support of the search warrant did not adequately set forth the unnamed informant's basis of knowledge and therefore failed to establish probable cause. *State* v. *Barton,* supra, 70. Both courts accordingly agreed that the evidence seized in reliance upon the warrant had to be suppressed. Id.

In the present appeal, the state urges us to overrule our holding in *State* v. *Kimbro,* supra, and to adopt the "totality of the circumstances" standard for determining probable cause used in the federal courts pursuant to the decision of the United States Supreme Court in *Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983). The state argues that our decision in *Kimbro* (1) did not accurately reflect either the preconstitutional law of Connecticut or the case law of this court construing article first, § 7, prior to the time when the fourth amendment to the federal constitution was made applicable to the states, and (2) needlessly constitutionalized a standard for the use of hearsay in warrant affidavits that is susceptible to rigid and inconsistent application by lower courts and that impairs legitimate law enforcement efforts. The state argues, alternatively, that the trial court and the Appel-

late Court were mistaken in concluding, under any standard of review, that the affidavit in this case failed to establish probable cause. We agree with the state that application of the standards mandated by *Kimbro* has resulted at times in unduly technical readings of warrant affidavits, and we reject such an inappropriate methodology.

In deciding this question, we consider first the analysis that led the United States Supreme Court to reject the *Aguilar-Spinelli* test. We next examine the constitutional basis underlying *Kimbro* to distinguish the goals we sought to achieve in retaining the *Aguilar-Spinelli* test in that decision from the nonconstitutional encrustations that accompanied it. Finally, we review the warrant affidavit at issue in this case to determine whether it satisfies the requirements of article first, § 7. We conclude that it does.

I

A

In *Illinois* v. *Gates,* supra, 235, the United States Supreme Court rejected the "complex superstructure of evidentiary and analytical rules" that had evolved from its earlier decisions in *Aguilar* v. *Texas,* supra, and *Spinelli* v. *United States,* supra. As commonly cited and applied, the "two-pronged" *Aguilar-Spinelli* test provides a method for evaluating the existence of probable cause consistent with the requirements of the fourth amendment[3] when a search warrant affidavit

---

[3] The fourth amendment to the United States constitution, made applicable to the states through the due process clause of the fourteenth amendment in *Wolf* v. *Colorado,* 338 U.S. 25, 28, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949), provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

is based upon information supplied to the police by a confidential informant. The issuing judge must be informed of (1) some of the underlying circumstances relied on by the informant in concluding that the facts are as he claims they are, and (2) some of the underlying circumstances from which the officer seeking the warrant concluded (a) that the informant, whose identity need not be disclosed, was credible, or (b) that the information was reliable. *State* v. *Ruscoe,* 212 Conn. 223, 228–29, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990); *State* v. *Delmonaco,* 194 Conn. 331, 338, 481 A.2d 40, cert. denied, 469 U.S. 1036, 105 S. Ct. 511, 83 L. Ed. 2d 401 (1984). When the information supplied by the informant fails to satisfy the *Aguilar-Spinelli* test, probable cause may still be found if the warrant application affidavit sets forth other circumstances—typically independent police corroboration of certain details provided by the informant—that bolster the deficiencies. *State* v. *Ruscoe,* supra, 229.

The *Gates* court identified two principal flaws in the *Aguilar-Spinelli* test. First, because courts and commentators had generally regarded the two prongs of the test to be entirely independent of each other, courts had struggled to formulate rules regarding what types of information and what types of corroboration might satisfy each of the prongs. *Illinois* v. *Gates,* supra, 229 n.4; see also 1 W. LaFave, Search and Seizure (2d Ed. 1987) § 3.3 (a), pp. 612–27. Specifically, some courts had concluded that independent police investigation might corroborate the "reliability" of the information, but could never satisfy the "basis of knowledge" prong of the test, while ample "self-verifying details" might establish that the informant had personal knowledge of the alleged activity and thus could satisfy the "basis of knowledge" prong, but could never compensate for a deficiency in the "veracity" or "reliability" prong.

See, e.g., *Stanley* v. *State,* 19 Md. App. 507, 313 A.2d 847 (1974); see also *Draper* v. *United States,* 358 U.S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959). The "elaborate set of legal rules" that had resulted from this emphasis on the independent character of the two prongs had led courts, in many cases, to dissect warrant applications in an excessively technical manner, "with undue attention being focused on isolated issues that [could not] sensibly be divorced from the other facts presented to the magistrate." *Illinois* v. *Gates,* supra, 229, 234–35. Such a result was inconsistent with the nature of a probable cause determination, which, as the *Gates* court noted, involves a " 'practical, nontechnical conception.' " Id., 231, quoting *Brinegar* v. *United States,* 338 U.S. 160, 176, 69 S. Ct. 1302, 93 L. Ed. 1879, reh. denied, 338 U.S. 839, 70 S. Ct. 31, 94 L. Ed. 513 (1949).

The second principal flaw in the application of the *Aguilar-Spinelli* test, according to the *Gates* court, was that the test had caused reviewing courts, both at suppression hearings and at appellate levels, to test the sufficiency of warrant affidavits by de novo review. *Illinois* v. *Gates,* supra, 236. Such de novo review, in the view of the *Gates* majority, was inconsistent with the constitution's "strong preference for searches conducted pursuant to a warrant." A reviewing court should rather determine whether the magistrate issuing the warrant had a "substantial basis" for concluding that a search would uncover evidence of criminal activity. Id.

In rejecting the complex structure of rules that had evolved from *Aguilar* and *Spinelli,* however, the *Gates* court did not reject out of hand the underlying concerns that had originally been expressed in *Aguilar.* In that case, the United States Supreme Court invalidated a search warrant supported by an affidavit that stated only that the "[a]ffiants have received reliable information

from a credible person," without stating any of the underlying circumstances that would support a finding of probable cause. *Aguilar* v. *Texas,* supra, 109. The *Aguilar* court ruled that such a conclusory affidavit failed to state a factual basis on which a neutral and detached magistrate could determine the existence of probable cause. Id., 113–14. In *Gates,* the court reaffirmed that the "veracity" or "reliability" and the "basis of knowledge" inquiries formulated in *Aguilar* remain "highly relevant" in the determination of probable cause and should be regarded as "closely intertwined issues that may usefully illuminate the commonsense, practical question" of the existence of probable cause to believe that contraband or evidence is located in a particular place. *Illinois* v. *Gates,* supra, 230. The *Gates* court abandoned only a "rigid compartmentalization" of the inquiries and denied that the court had ever intended them to be understood as "entirely separate and independent requirements to be rigidly exacted in every case." Id.

In the place of the "compartmentalized" *Aguilar-Spinelli* test, the *Gates* court directed lower courts to apply a "totality of the circumstances" analysis more consistent with traditional assessments of probable cause. While still employing the analytical frame of reference established in *Aguilar,* a "totality of the circumstances" analysis permits a judge issuing a warrant greater freedom to assess "the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip." Id., 234. Under the analysis approved in *Gates,* "[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

Id., 238. The task of a subsequent court reviewing the magistrate's decision to issue a warrant is to determine whether the magistrate had a "substantial basis" for concluding that probable cause existed. Id., 238–39.

The court's decision in *Gates* emphasized the necessity of a case-by-case analysis of probable cause based on *all* of the facts presented to the judge issuing the warrant, not merely on those capable of categorization as indicating the "veracity" or "basis of knowledge" of a particular informant. Underlying the court's emphasis on the factbound nature of the probable cause determination were two premises: first, that probable cause is a practical, commonsense determination, requiring " 'only the probability, and not a prima facie showing, of criminal activity' "; id., 235, quoting *Spinelli* v. *United States,* supra, 419; and second, that one of the principal safeguards of the fourth amendment's warrant requirement is the interposition of a neutral and detached magistrate who is charged with exercising discretion to arrive at an informed and independent decision as to whether probable cause exists. *Illinois* v. *Gates,* supra, 239–40. Because none of these underlying propositions are in apparent conflict with our prior decisions construing Connecticut's probable cause requirement, we turn now to a reconsideration of our decision in *State* v. *Kimbro,* supra.

## B

We note, at the outset, that our decision in *Kimbro* did not rely upon historical analysis to determine the standard by which probable cause should be measured.[4]

---

[4] The state correctly argues in this appeal that the sparse preconstitutional and early constitutional history of article first, § 7, would not support the conclusion that our state constitution mandated a stricter standard for the determination of probable cause than did the federal constitution. Although cases decided as matters of common law prior to the adoption of the state's first postrevolutionary constitution indicate that independent magisterial review was required before a search warrant could issue; see *Frisbie* v.

We relied, rather, upon our determination that the *Aguilar-Spinelli* test, "with its two prongs of 'veracity' or 'reliability' and 'basis of knowledge,' offers a practical and independent test under our constitution that predictably guides the conduct of all concerned, including magistrates and law enforcement officials, in the determination of probable cause." *State* v. *Kimbro,* supra, 236–37. We regarded the *Gates* "totality of the circumstances" analysis as an "amorphous standard" that inadequately safeguarded the rights of indi-

*Butler,* Kirby 213 (1787), and *Grumon* v. *Raymond,* 1 Conn. 40 (1814); no state statutory or constitutional provision requiring the existence of probable cause for the issuance of warrants existed until Connecticut's citizens adopted the constitution of 1818. See C. Collier, "The Connecticut Declaration of Rights before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 93 n.19 (1982). The declaration of rights adopted in 1818 appears to have its antecedents in the Mississippi constitution of 1817, which in turn derived from the federal bill of rights and the Virginia declaration of rights of 1776. Id., 96–97 n.30. The search and seizure provision in our 1818 constitution, then article first, § 8, closely resembles the fourth amendment to the United States constitution. Although its enumeration was changed to article first, § 7, when the 1965 constitution incorporated article first, § 4, into article seventh, its language has not been altered since its original adoption.

This court seldom had occasion to construe the search and seizure provision of our constitution prior to the mid-twentieth century. In 1862, this court considered whether then article first, § 8, required an affiant to inform the magistrate issuing the warrant of the underlying facts and circumstances upon which the affiant had concluded that probable cause exists. See *Lowrey* v. *Gridley,* 30 Conn. 450 (1862). This court determined that an affiant's oath that he had "reason to believe" probable cause existed was sufficient to satisfy our constitution's probable cause requirement, even when the affiant was a prosecutor relying upon "a secret and confidential communication" from an alleged accomplice. Id., 457–59. Federal courts, in contrast, appear to have required a statement of the circumstances giving rise to the belief that probable cause existed in order to determine the sufficiency of the affidavits. See, e.g., *Locke* v. *United States,* 11 U.S. (7 Cranch) 339 (1813). In 1933, the United States Supreme Court, relying on the assumptions of prior federal cases such as *Locke,* expressly ruled that the fourth amendment to the federal constitution requires such a statement of underlying circumstances in order to satisfy the magistrate issuing the warrant that probable cause for a search and seizure exists. *Nathanson* v. *United States,* 290 U.S. 41, 47, 54 S. Ct. 11, 78 L. Ed. 159 (1933).

viduals to be free from unjustified intrusions. *State* v. *Kimbro*, supra, 230–31, 237. Upon careful review of that determination, we agree with the conclusion of the United States Supreme Court in *Gates* that the two prongs of the *Aguilar-Spinelli* test are highly relevant evidentiary questions that a magistrate issuing the warrant must consider in deciding whether probable cause for a search or seizure exists, but that they are not wholly independent and dispositive constitutional tests for which de novo review exists at a suppression hearing. See *Illinois* v. *Gates,* supra, 230.

In reaching our present conclusion we return to first principles. Article first, § 7, of our constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation." This provision, like the fourth amendment to the federal constitution that it closely resembles,[5] safeguards the privacy, the personal security, and the property of the individual against unjustified intrusions by agents of the government.[6]

One of the principal means by which the warrant requirement protects the privacy and property of the individual is by the interposition of a neutral and detached magistrate[7] who must judge independently

[5] See footnote 3, supra, for the text of the fourth amendment to the United States constitution.

[6] Justice Story noted that the fourth amendment to the federal constitution "seems indispensable to the full enjoyment of the rights of personal security, personal liberty, and private property. It is little more than the affirmance of a great constitutional doctrine of the common law." 3 J. Story, Commentaries on the Constitution (1833) § 1895, p. 748.

[7] The term "magistrate," in this context, refers to a judicial officer authorized to issue warrants. In Connecticut, unlike many jurisdictions, only judges of the Superior Court are authorized to issue warrants. See General Statutes § 54-33a.

the sufficiency of an affidavit supporting an application for a search warrant.[8] Whether applying the fourth amendment or article first, § 7, of our own constitution,[9] we have frequently recognized that a magistrate issuing a warrant cannot form an independent opinion as to the existence of probable cause unless the affidavit supporting the warrant application sets forth some of the facts upon which the police have relied in concluding that a search is justified. " 'Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police.' " *State* v. *Rose,* 168 Conn. 623, 627, 362 A.2d 813 (1975), quoting *United States* v. *Ventresca,* 380 U.S. 102, 109, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965).

---

[8] Our earliest recorded cases involving search warrants indicate the importance we have long attached to the interposition of a neutral magistrate between the citizen and the law enforcement officer who desires to search his property or his person. In *Frisbie* v. *Butler,* Kirby 213, 215 (1787), the court observed that "it is the duty of a justice of the peace granting a search warrant (in doing which he acts judicially) to limit the search to such particular place or places, as he, from the circumstances, shall judge there is reason to suspect . . . . " At common law, both the judge who issued a defective or insufficiently limited warrant and the officer who executed it could be held liable in trespass to the person whose property was searched. *Grumon* v. *Raymond,* 1 Conn. 40, 47–48 (1814). As *Grumon* indicates, a judge who attempted to issue a valid warrant but erred through some oversight or mistake would not be liable for trespass, but a judge who issued an overbroad warrant enjoyed no immunity. From this common law distinction we can infer that magistrates were expected to consider the precise factual situation described to them and independently to limit the search in accordance with the purposes that they deemed to be lawful.

[9] It is true that more than one century ago this court concluded that a magistrate could issue a warrant on the basis of a prosecutor's oath that he had reason to suspect criminal activity, without a statement of the underlying circumstances on which his suspicion was founded. *Lowrey* v. *Gridley,* 30 Conn. 450, 457 (1862). In this century, however, we have rejected such conclusory affidavits under both the state and federal constitutions. See, e.g., *State* v. *Heinz,* 193 Conn. 612, 617, 480 A.2d 452 (1984). In *Heinz,* we regarded the fourth amendment and article first, § 7, as equally requiring that the warrant application set forth some of the facts on which the affiant relied.

When a police officer seeking a search warrant relies on hearsay information supplied by confidential informants rather than on personal knowledge and observations, certain additional facts are necessary to ensure that the magistrate's decision to issue the warrant is informed and independent. The *Aguilar* test originated when the United States Supreme Court identified two additional factors that magistrates must consider in evaluating the existence of probable cause in such cases: (1) the reliability of the way in which the informant reached his conclusions about the alleged illegal activity; and (2) the circumstances from which the police concluded that the informant was credible or that the information itself was reliable. *Aguilar* v. *Texas,* supra, 114.

Although *Aguilar* spawned progeny that became noted for their technicality, the court's analysis in *Aguilar* itself was pragmatic and commonsensical. Its unstated premise was that confidential informants[10] are themselves often "criminals, drug addicts, or even pathological liars" whose motives for providing information to the police may range from offers of immunity or sentence reduction, promises of money payments, or "such perverse motives as revenge or the hope of eliminating criminal competition." M. Rebell, "The Undisclosed Informant and the Fourth

---

[10] Although anyone who gives information to the police in confidence might be called a "confidential informant," the term is usually employed in a more restricted sense to describe a person who is himself in the underworld, so that he is particularly well placed to know its secrets. Courts have properly distinguished between such "confidential informants" and the average citizen who, as a victim or a witness, happens to have information useful to the police. Such "citizen informers" are considered more deserving of credibility than are underworld informers, and courts have accordingly tended to examine the basis and sufficiency of a citizen informer's information more closely than his credibility. 1 W. LaFave, Search and Seizure (2d Ed. 1987) § 3.3, p. 611, and § 3.4, pp. 712–49; M. Harney & J. Cross, The Informer in Law Enforcement (2d Ed. 1968) p. 40; see also *State* v. *Daley,* 189 Conn. 717, 723–24, 458 A.2d 1147 (1983).

Amendment: A Search for Meaningful Standards," 81 Yale L.J. 703, 712–13 (1972); see also 1 W. LaFave, Search and Seizure (2d Ed. 1987) § 3.3, p. 611. Because such an informant's reliance on rumors circulating on the street is not unlikely and the veracity of such an informant is questionable, a magistrate reviewing a search warrant application based on such an informant's word can best assess the probable reliability of the information if she or he is informed of some of the predicate facts that indicate *how* the informant gained his information and *why* the police officer believes that the information is reliable in order to decide, independently, whether the police officer's inferences from the informant's statements are reasonable.

In *Kimbro,* we expressed concern that the "fluid" "totality of the circumstances" analysis approved in the fourth amendment context of *Illinois* v. *Gates,* supra, would inadequately inform magistrates and law enforcement officials of their obligation to scrutinize the information gathered from confidential police informants with appropriate caution. *State* v. *Kimbro,* supra, 233–38. In construing article first, § 7, of our constitution to require continued application of the *Aguilar-Spinelli* test, we sought to make clear certain benchmarks to guide the discretion of our judges in reviewing ex parte applications for search and seizure warrants based on confidential informants' tips.

Nonetheless, over time, the case law applying the *Aguilar-Spinelli* test has come to be encrusted with an overlay of analytical rigidity that is inconsistent with the underlying proposition that it is the constitutional function of the magistrate issuing the warrant to exercise discretion in the determination of probable cause. That discretion must be controlled by constitutional principles and guided by the evidentiary standards developed in our prior cases, but it should not be so shackled by rigid analytical standards that it deprives

the magistrate of the ability to draw reasonable inferences from the facts presented. To the extent that *Kimbro* stands for the proposition that the exercise of discretion by a magistrate is reviewable only according to fixed analytical standards, it is overruled.

Our adoption of a "totality of the circumstances" analysis does not mean, however, that a magistrate considering a search warrant application should automatically defer to the conclusion of the police that probable cause exists. Such deference would be an abdication of the magistrate's constitutional responsibility to exercise an independent and detached judgment to protect the rights of privacy and personal security of the people of Connecticut.

In essence, our adoption of a "totality of the circumstances" analysis of the probable cause requirement of article first, § 7, of our constitution means simply this: When a search warrant affidavit is based on information provided to the police by confidential informants, the magistrate should examine the affidavit to determine whether it adequately describes both the factual basis of the informant's knowledge and the basis on which the police have determined that the information is reliable. If the warrant affidavit fails to state in specific terms how the informant gained his knowledge or why the police believe the information to be trustworthy, however, the magistrate can also consider all the circumstances set forth in the affidavit to determine whether, despite these deficiencies, other objective indicia of reliability reasonably establish that probable cause to search exists. In making this determination, the magistrate is entitled to draw reasonable inferences from the facts presented. When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer

to the reasonable inferences drawn by the magistrate. Where the circumstances for finding probable cause are detailed, where a substantial basis for crediting the source of information is apparent, and when a magistrate has in fact found probable cause, the reviewing court should not invalidate the warrant by application of rigid analytical categories. See *United States* v. *Ventresca,* supra, 109.

In adopting the *Gates* "totality of the circumstances" analysis, as we have here construed it, as the standard of analysis applicable to article first, § 7, of our constitution, we do not intend to dilute the constitutional safeguards of the warrant requirement. This court has both the constitutional duty to construe article first, § 7, in a way that adequately protects the rights of individuals in Connecticut and also the supervisory responsibility, as the overseer of the judiciary in Connecticut, to ensure that the standards adopted here require law enforcement officers to provide magistrates with adequate information on which to base their decisions in an ex parte context. If a warrant affidavit does not provide a substantial basis for the finding of probable cause, then evidence or contraband seized in the execution of that warrant will be suppressed, even when the officer executing the warrant has relied in good faith on its authority. *State* v. *Marsala,* 216 Conn. 150, 171, 579 A.2d 58 (1990). In rejecting a good faith exception to cure errors in warrants, we expressly focused on the importance attached in this state to providing reliable and probative information to Superior Court judges, who are the only persons authorized to issue warrants in this state. Id., 169–70.

Our adoption here of federal constitutional precedents that usefully illuminate the open textured provisions of our own organic document in no way compromises our obligation independently to construe the provisions of our state constitution. *State* v. *Lamme,*

216 Conn. 172, 184, 579 A.2d 484 (1990). As we have observed in the past, federal constitutional and statutory law "establishes a *minimum* national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Emphasis added.) *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984). In particular circumstances, therefore, and with regard to particular provisions of our own constitution, we have concluded that our constitution provides more substantive protection of individual rights than does its federal counterpart. *State* v. *Marsala,* supra, 160. Respect for settled interpretations of the organic law of our own state, moreover, requires that we examine changes in the interpretation of federal constitutional provisions to determine whether they are consistent with the history and policy concerns of analogous Connecticut constitutional provisions before adopting such changes as a matter of state constitutional law. In this case we conclude, upon careful reconsideration, that the "totality of the circumstances" analysis adopted in *Gates* will continue to guarantee the people of Connecticut "the full panoply of rights" that they have come to expect as their due. Id.; *Horton* v. *Meskill,* 172 Conn. 615, 642, 376 A.2d 359 (1977). We accordingly depart from the more rigid analytical structure imposed in *Kimbro* in order to restore the proper constitutional authority of magistrates to weigh the sufficiency of the information presented to them in warrant affidavits and to balance the legitimate needs of law enforcement officers against the highly prized rights of privacy and personal security afforded by our constitution.

II

We now consider the affidavit presented in this case in light of the proper constitutional standards. The Winsted police presented the warrant application for ex parte judicial approval on August 7, 1988. The affi-

davit attached to the application stated that the police had received the relevant information from an informant earlier on the same day. The affidavit consisted of five paragraphs,[11] four of which have little significance for the determination of probable cause in this case. The first two paragraphs recite the training and experience of the affiants, two Winsted police officers. The fourth paragraph identifies the owners of the property that was the subject of the search, and the fifth paragraph requests that the court issue the warrant on the basis of the information provided. As both the trial court and the Appellate Court concluded, the third paragraph is the only basis upon which probable cause could have been established. *State* v. *Barton,* supra, 65–66.

That paragraph provides: " 'That the affiants state on Sunday, August 7, 1988 Sgt. Gerald O. Peters received information from a confidential informant at police headquarters pertaining to Tim Barton who resides at 232 Perch Rock Trail, Winsted, Connecticut, first floor that Barton has in his apartment a large quantity of marijuana in plastic garbage bags, which are kept in a closet. That the informant also provided Sergeant Peters of [sic] a sample of the marijuana that is in the bags. A field test of the marijuana substance that was provided to Sgt. Peters was field tested and the test results was [sic] positive for cannibas [sic] substance. The informant further stated that Tim Barton operates a Texas registered vehicle and after being away for approximately one week Barton returned home on Saturday, August 6, 1988 and unloaded several large plastic bags in the evening hours. The informant further stated that shortly after that four to five people arrived at the Barton apartment and stayed a short while and then left with plastic garbage bags.' " Id., 66.

---

[11] The text of these paragraphs is reproduced in the Appellate Court's decision. *State* v. *Barton,* 22 Conn. App. 62, 65–66 n.3, 576 A.2d 561 (1990).

Probable cause, broadly defined, comprises such facts "as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe" that criminal activity has occurred. *Stone* v. *Stevens,* 12 Conn. 218, 230, 30 A. 611 (1837); see also *State* v. *Middleton,* 170 Conn. 601, 604, 368 A.2d 66 (1976). Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity; and (2) there is probable cause to believe that the items named will be found in the place to be searched. *State* v. *Shifflet,* 199 Conn. 718, 745–46, 508 A.2d 748 (1986); *State* v. *DeChamplain,* 179 Conn. 522, 528–29, 427 A.2d 1338 (1980). Unless the defendant makes a substantial preliminary showing that the affiant knowingly and intentionally or recklessly included a false statement in the warrant affidavit; see *Franks* v. *Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978); a reviewing court can consider only the information that was actually in the warrant affidavit presented to a judge issuing a warrant at the time that he or she signed the warrant. *State* v. *Shifflet,* supra, 746; see *Aguilar* v. *Texas,* supra, 109 n.1.

Reviewing the allegations set forth in the third paragraph of the affidavit in this case, the Appellate Court concluded that the affidavit failed to establish probable cause because it was defective under the "basis of knowledge" prong of the *Aguilar-Spinelli* test mandated by *Kimbro*. The Appellate Court cited the following deficiencies: (1) the affidavit did not expressly indicate that the informant had ever been inside the defendant's apartment; (2) the details regarding the truck and the carrying in and out of garbage bags were "innocuous"; (3) the affidavit did not indicate that the informant had said that he had purchased the marihuana from the defendant, or that he had observed the defendant "constantly in possession" of marihuana in

the apartment; and (4) the informant did not give a detailed description of the apartment but merely alleged that the garbage bags were in a closet. *State v. Barton,* supra, 68–70. We agree that the affidavit does not expressly state that the informant had personal knowledge of the facts described. Legitimate law enforcement efforts, however, should not be unduly frustrated because a police officer, in the haste of a criminal investigation, fails to recite his information in particular formulaic phrases. Probable cause does not depend upon the incantation of certain magic words. Having reviewed the circumstances described by the informant, we conclude that the affidavit provided a substantial basis for the magistrate's inference that the informant was reporting events that he had personally observed.

This inference could reasonably be drawn from the following facts. First, the affidavit reported that the informant provided the police with a sample of marihuana that had come from the garbage bags. Although that fact alone might not support an inference that the informant had personally seen the bags, other details in the affidavit do provide a basis for such an inference. The informant said that the defendant had been out of town for about a week and had returned the previous night, in a truck with a Texas registration, with several large plastic garbage bags, and that shortly after the defendant's arrival four or five other individuals had come to the defendant's apartment and had left soon afterwards with plastic garbage bags. These details, if credited, support an inference that the informant was sufficiently acquainted with the defendant to have known of a week-long absence and to have been present to observe the defendant's activities upon his return. When considered together with the detail that the garbage bags were kept in a closet and with the fact that the informant provided the police with a mar-

ihuana sample purportedly from the same bags, these details support a reasonable, commonsense inference that the informant had personally observed the events he reported and had secured the marihuana sample directly from the defendant at his apartment. The affidavit did not merely state that an informant had reason to believe that marihuana could be found at the defendant's apartment; rather, it provided "some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were." *Aguilar* v. *Texas,* supra, 114. Although the magistrate could have properly exercised his discretion to reject the warrant application or to require the affiants to supplement it or corroborate some of its details; see *Illinois* v. *Gates,* supra, 240; we conclude that the inference drawn by the magistrate that the informant had firsthand knowledge of the defendant's activities was not unreasonable.

Because the Appellate Court invalidated the warrant for its failure to state expressly the basis of the informant's knowledge, it did not proceed to consider the question of the informant's "veracity" or "reliability." *State* v. *Barton,* supra, 70. The trial court, however, concluded that the informant's veracity was adequately established because the act of providing a sample of the marihuana to the police was a "declaration against his penal interest." We agree that the affidavit provided a substantial basis for the magistrate's inference that the informant's information was reliable.

The first circumstance supporting an inference of "veracity" or "reliability" is the fact that the informant was not anonymous. The affidavit states that the informant provided his statement in person at police headquarters. Because his identity was known to the police, the informant could expect adverse consequences if the information that he provided was erroneous. Those consequences might range from a loss of confidence or

indulgence by the police to prosecution for the class A misdemeanor of falsely reporting an incident under General Statutes § 53a-180, had the information supplied proved to be a fabrication.

More significantly, however, the informant supplied the police with a sample of a substance that the police tested and confirmed to be marihuana. By entering the police station with the marihuana in his possession and by exhibiting the marihuana to the police, the informant rendered himself liable to arrest, conviction, and imprisonment under General Statutes § 21a-279. "People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." *United States* v. *Harris,* 403 U.S. 573, 583, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971); *State* v. *Daley,* 189 Conn. 717, 721–24, 458 A.2d 1147 (1983). Although the informant's motive may be no loftier than the hope of leniency on other charges or the promise of a payment, courts have thought "that one who knows the police are already in a position to charge him with a serious crime will not lightly undertake to divert the police down blind alleys." 1 W. LaFave, Search and Seizure (2d Ed. 1987) § 3.3 (c), p. 649. In the present case, the informant did more than make an incriminating admission that might or might not support a subsequent conviction; here he actually provided the physical evidence of his illegal possession to the police. Although the warrant application would have unquestionably been stronger if the affiants had bolstered the reliability of the informant by independently corroborating some of the details he reported; see, e.g., *State* v. *Ruscoe,* supra, 229–31; *State* v. *Daley,* supra; we conclude that the affidavit sufficiently set forth "some of the underlying circumstances" from

which the police could have concluded that the informant was credible or that his information was reliable. *Aguilar* v. *Texas,* supra.

As our discussion of this affidavit demonstrates, the determination of an informant's "veracity" or "reliability" and "basis of knowledge" remains highly relevant under the constitutional standard announced in this decision. As a matter of state constitutional law under article first, § 7, the task of the magistrate issuing the warrant is to make a practical, nontechnical decision whether there is a fair probability of finding contraband or evidence of a crime in a particular place. In coming to that decision, the magistrate must consider all the circumstances set forth in the affidavit, including the factual circumstances from which the "veracity" and the "basis of knowledge" of persons supplying hearsay information can be determined. A reviewing court, in turn, must determine that the affidavit presented a substantial factual basis upon which the magistrate could conclude that probable cause existed. See *Illinois* v. *Gates,* supra, 238–39; see also *Alabama* v. *White,* 496 U.S. 325, 328–29, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990) (discussing the continuing relevance of "veracity" and "basis of knowledge" inquiries when relying on informants' tips). "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States* v. *Ventresca,* supra. This is a marginal case; the magistrate could reasonably have demanded more information. We will not invalidate a warrant, however, merely because we might, in the first instance, have reasonably declined to draw the inferences that were necessary here. Having reviewed all the circumstances presented to the magistrate in this affidavit, we conclude that the affi-

davit provided a substantial basis for concluding that probable cause existed. We accordingly reverse the judgment of the Appellate Court.

The judgment is reversed and the case is remanded to the Appellate Court with direction to reverse the judgment of the trial court and to remand the case to the trial court for further proceedings.

In this opinion SHEA, CALLAHAN, COVELLO, BORDEN and SANTANIELLO, Js., concurred.

GLASS, J., concurring in part, dissenting in part. I concur in the result reached by the majority in this case because, unlike the majority, I conclude that the disputed warrant meets the established requirements of the time honored *Aguilar-Spinelli* test.[1] *Spinelli* v. *United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *Aguilar* v. *Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964). Because I disagree with the majority's decision to scrap the *Aguilar-Spinelli* test by overruling *State* v. *Kimbro,* 197 Conn. 219, 496 A.2d 498 (1985), in arriving at that result, I write separately in dissent.

In *Kimbro,* this court held that adherence to the *Aguilar-Spinelli* test is "constitutionally mandated under article first, § 7, of the Connecticut constitution," a provision found to afford "more substantive protection" to the citizenry of this state "than does the fourth amendment to the federal constitution in the determination of probable cause." *State* v. *Kimbro,* supra, 233,

---

[1] Considering the marihuana sample and the information contained in the affidavit, as well as the reasonable inferences, as set forth in part II of the majority opinion, that can be drawn therefrom, I conclude that the warrant exhibits adequate information independently to demonstrate the informant's "veracity" and "basis of knowledge" as required by the *Aguilar-Spinelli* test for determining probable cause.

238.[2] The majority has now seen fit to overrule *Kimbro,* thereby discarding the *Aguilar-Spinelli* test in favor of the *Gates* approach to warrant sufficiency,[3] the approach rejected in *Kimbro* as far too fluid and lacking in precise, predictable guidelines to ensure that Connecticut citizens are "secure in their persons, houses, papers and possessions from unreasonable searches and seizures . . . . " Conn. Const., art. I, § 7; see *State v. Kimbro,* supra, 235–36.

Dressed today in Connecticut constitutional finery, the *Gates* approach relegates the principles pertinent to the "veracity" and "basis of knowledge" prongs of the *Aguilar-Spinelli* test to the status of "relevant considerations" among the amorphous "totality of the circumstances." The purported relevance of these "considerations," however, is belied by the majority's suggestion that "despite" "deficiencies" under both prongs of the *Aguilar-Spinelli* test, a warrant may yet derive sufficient sustenance from the "totality of the circumstances" to satisfy the mandates of our constitution. The majority thus appears to have strayed even further beyond the strictures of *Aguilar-Spinelli* than the *Gates* majority, which proposed that "a deficiency in one [of the prongs of the *Aguilar-Spinelli* test] may

[2] See also *Commonwealth* v. *Upton,* 394 Mass. 363, 373, 476 N.E.2d 548 (1985) (rejecting the " 'unacceptably shapeless and permissive' " *Gates* approach and retaining the *Aguilar-Spinelli* test on state constitutional grounds); *State* v. *Jackson,* 102 Wash. 432, 435, 688 P.2d 136 (1984) (retaining *Aguilar-Spinelli* under the Washington constitution in lieu of the "nebulous" *Gates* approach).

[3] It is worth noting that experts in the search and seizure field have decried as untenable the string of propositions forming the foundation of the majority opinion in *Gates. Illinois* v. *Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983); see Y. Kamisar, "*Gates,* 'Probable Cause,' 'Good Faith,' and Beyond," 69 Iowa L. Rev. 551 (1984); W. LaFave, "Fourth Amendment Vagaries (Of Improbable Cause, Imperceptible Plain View, Notorious Privacy, and Balancing Askew)," 74 J. Crim. L. & Criminology 1171, 1186–97 (1983); see also *State* v. *Jackson,* 102 Wash. 432, 688 P.2d 136 (1984).

be compensated for . . . by a strong showing as to the other, or by some other indicia of reliability."[4] *Illinois* v. *Gates,* supra, 233. Under the majority's evident reading of *Gates,* a warrant deficient under both prongs of the *Aguilar-Spinelli* test, nevertheless, complies with Connecticut constitutional requirements where the "totality of the circumstances" permit.

In whatever form, I fail to see how the elusive *Gates* approach "will continue to guarantee the people of Connecticut 'the full panoply of rights' that they have come to expect as their due." The rights guaranteed to our citizens under article first, § 7, of the Connecticut constitution " 'belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.' " *Illinois* v. *Gates,* supra, 274–75, (Brennan, J., dissenting). After today's toppling of the analytical framework of the *Aguilar-Spinelli* test, the principles of which the majority deems procedural encrustations that unduly inhibit a magistrate's "discretion in the determination of probable cause," just what remains to control that discretion, or for that matter, to guide the conduct of the warrant seeking police? Such actors, unfettered by meaningful standards by which to discharge their respective functions in the war-

---

[4] In his concurring opinion in *Gates,* Justice White forcefully notes that the *Gates* majority's proposal that a "strong showing" under one of the *Aguilar-Spinelli* prongs may compensate for deficiency under the other cannot be taken literally. See *Illinois* v. *Gates,* 462 U.S. 213, 272–73, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) (White, J., concurring). "Were [*Gates*] so interpreted, it would lead to the bizarre result, repeatedly rejected by the [United States Supreme] Court in the past in cases reaffirmed by the *Gates* majority, that the unsupported assertion or belief of an honest person satisfies the probable cause requirement." 1 W. LaFave & J. Israel, Criminal Procedure (1984) § 3.3, p. 194.

rant process, are now granted the unbridled play to accord weight to their subjective preferences in determining the "circumstances" whose "totality" permissibly adds up to probable cause. See Y. Kamisar, "*Gates,* 'Probable Cause,' 'Good Faith,' and Beyond," 69 Iowa L. Rev. 551, 571 (1984).

"[C]onsisting largely of an exhortation to use common sense," the *Gates* approach thus "enhances the risk that probable cause determinations will be grounded more upon the predilections of the decisionmaker and less upon established principles of law . . . ." W. LaFave, "Fourth Amendment Vagaries (Of Improbable Cause, Imperceptible Plain View, Notorious Privacy, and Balancing Askew)," 74 J. Crim. L. & Criminology 1171, 1190 (1983). That risk is not perceptibly diminished by the "reasonably" established by "other objective indicia of reliability" standard that the majority would apply where a warrant proves deficient under both prongs of the remains of *Aguilar-Spinelli.* Absent ascertainable guidelines, what "other" "indicia" objectively display the requisite magnitude of reliability to "reasonably" establish probable cause depends on the eye of the beholder, whether a police officer, a magistrate or a reviewing court.[5]

For the above reasons, I consider the *Gates* approach to warrant sufficiency a poor substitute for the principled guidelines of the *Aguilar-Spinelli* test found in *Kimbro* to be rooted in the Connecticut constitution. The *Aguilar-Spinelli* test, in my opinion, allows ample room for the application of common sense and the evaluation of the unique facts presented by particular cases. I do not, therefore, share the majority's desire to strip probable cause determinations of the "fixed, analyti-

---

[5] As one commentator pointedly suggests, the *Gates* approach " 'discourage[s] active review even by the most conscientious appellate judges.' " Y. Kamisar, "*Gates,* 'Probable Cause,' 'Good Faith,' and Beyond," 69 Iowa L. Rev. 551, 571 (1984).

cal standards" of *Aguilar-Spinelli* that have served to protect the free men and women of Connecticut from unreasonable government intrusion in a way that the standardless *Gates* approach, I submit, will never do. As this court recognized in *Kimbro,* we, as the court of last resort in this sovereign state, are not bound to contract the contours of our state constitution to mirror the United States Supreme Court's increasingly restrictive perception of the scope of the individual liberties guaranteed by the federal constitution. *State* v. *Kimbro,* supra, 234 n.16. We refused to do so in *Kimbro.*[6] In my view, the Connecticut constitution is not a document so fragile that a swift stroke of the federal pen suffices, as is allowed today, to erode the substantive protections found not six years ago to be afforded thereunder to the citizens of this state.

Accordingly, I concur in the result reached by the majority, but respectfully dissent in the majority's overruling of *Kimbro* in the course of reaching that result.

---

[6] Furthermore, I do not consider the fact that *Kimbro* "did not rely upon historical analysis to determine the standard by which probable cause should be measured" sufficient to justify an endorsement of the standardless *Gates* approach. History has not previously hobbled this court's ability to apply common constitutional principles in a manner contrary to the application espoused by a majority of the United States Supreme Court. See *State* v. *Marsala,* 216 Conn. 150, 579 A.2d 58 (1990).